```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LARRY F. GILLIE,

                              Plaintiff,       No. 6:15-cv-06425(MAT)
                                               DECISION AND ORDER
              -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.
_____
```

## INTRODUCTION

Represented by counsel, Larry F. Gillie ("Plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act, challenging the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## PROCEDURAL STATUS

On October 12, 2011, Plaintiff protectively filed applications for DIB and SSI alleging disability since June 30, 2009, due to osteoarthrosis, organic mental disorder (chronic brain syndrome), arthropathies, learning disorder, asthma, depression, post-traumatic stress disorder ("PTSD"), social phobia, torn meniscus, and back pain. After these applications were denied, Plaintiff requested a hearing, which was conducted by administrative law judge Brian Kane ("the ALJ") on October 18,

2013, in Rochester, New York. Plaintiff appeared with his attorney and testified, as did impartial vocational expert Peter Manzi ("the VE"). T.33-69.[1] On February 21, 2014, the ALJ issued a decision finding Plaintiff not disabled. T.14-24. The Appeals Council denied Plaintiff's request for review on May 20, 2015, making the ALJ's decision the Commissioner's final decision. T.1-3. This timely action followed.

Plaintiff filed a Memorandum of Law, seeking reversal of the Commissioner's decision. The Commissioner filed a Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff did not file a Reply. For the reasons discussed below, the Commissioner's decision is reversed and the matter is remanded for further administrative proceedings.

**SUMMARY OF RELEVANT EVIDENCE**

**I.   Medical Evidence**

On May 11, 2010, an MRI of Plaintiff's right knee showed a tear of the posterior horn of the lateral meniscus, an intra-articular cyst, and small joint effusion. At an appointment with his primary care physician, Leesha Hoilette, M.D., Plaintiff reported difficulty ambulating due to pain. On examination, there was small joint effusion, some ligamental laxity, pain with flexion and extension, and a positive drawer test. A repeat MRI on

---

[1] Numbers preceded by "T." refer to pages from the administrative transcript, filed electronically by Defendant.

November 22, 2010 revealed mild degenerative changes and possible small sessile osteochondromas.

Plaintiff saw Dr. Hoilette throughout the relevant period. From October 30, 2009, to December 13, 2011, the medications and treatments prescribed by Dr. Hoilette were a knee brace for daily use; albuterol inhaler for asthma; cyclobenzaprine, Percocet, and Flexeril for knee pain; Chantix for smoking cessation; Trazodone as a sleep-aid; Flexeril for knee pain; Patanol eye drops; and omeprazole for gastro-esophogeal reflux disease ("GERD").

On September 26, 2011, Dr. Hoilette started Plaintiff on Cymbalta to address his severe depressive symptoms. Plaintiff was crying during his appointment and reporting feelings of helplessless and anxiety.

Plaintiff's knee surgery had been scheduled for September 30, 2010, but it was postponed due to transportation issues. Finally, on November 3, 2011, Dr. Robert Bronstein performed a right knee arthroscopy with partial lateral menisectomy to repair Plaintiff's torn right lateral meniscus. At a follow-up appointment with Dr. Bronstein on November 21, 2011, Plaintiff complained of knee pain. Dr. Bronstein referred him to physical therapy/rehabilitation.

Plaintiff attended physical therapy at URMC Orthopaedics-Sports Rehabilitation on eleven occasions between November 21,

2011, and January 23, 2012. See T.418-35. His compliance and attendance were noted to be "fair." T.418.

On December 13, 2011, Plaintiff reported to Dr. Hoilette that he was attending physical therapy but continued to have knee pain. On exam, Dr. Hoilette observed decreased range of motion in the right knee secondary to pain.

On January 23, 2012, after a one-month absence, Plaintiff returned to physical therapy and reported to Jillian Collins, DPT ("DPT Collins") that he had done "some dancing activities" since his last visit. T.421. He reported maximum pain occurring when dancing, and a sensation that the knee is "popping out." He reported minimal pain with walking distances. At the appointment, his pain was 0/10; his maximum pain was 6-7/10. T.425. On examination, he had a "very mildly antalgic gait." T.421. DPT Collins noted that Plaintiff was making progress with physical therapy, and had demonstrated overall improved strength, range of motion and function. She recommended "strengthening of hip to allow for proper form with dance movements and take stress off of knees." T.421. Overall, DPR Collins felt that Plaintiff was improving; he had met his long-term goal regarding knee flexion and range of motion, and was progressing toward his long-term goals regarding strength, function, and pain control. T.422. He had a "good" prognosis, would benefit from continued rehabilitation, and had no contraindications/precautions. T.421, 425.  After the last

appointment in January 2012, Plaintiff discontinued attending therapy, and the clinic was unable to contact him. T.418.

On February 3, 2012, about 10 days after his last physical therapy visit, Plaintiff saw Dr. Harbinder Toor, a consultative physician, at the Commissioner's request. T.379-82. Plaintiff described his knee pain as "constant, sharp, sometimes 10 out of 10." On examination, he had an abnormal gait, limping toward the right side. He had difficulty getting on and off the table and getting out of the chair. He had right knee flexion and extension to 140 degrees with tenderness, pain, and slight swelling. According to Dr. Toor, Plaintiff's prognosis is "guarded," and he has "moderate to severe limitations in standing walking, squatting and heavy lifting," and "moderate limitation [in] sitting a long time."

Also on February 3, 2012, Plaintiff underwent a consultative psychological examination with Dr. Christine Ransom. T.375-78. Plaintiff reported that he had been depressed for a while. His symptoms included trouble staying asleep, decreased appetite, weight loss, frequent crying spells, irritability, low energy, lack of motivation, lack of interest in his usual activities, wandering thoughts, and difficulty concentrating. He told Dr. Ransom that he sleeps a lot and isolates himself by spending a lot of time closed off in his room and not interacting with friends or family. On examination, Dr. Ransom noted that Plaintiff's motor behavior was

lethargic, his speech was slow and halting, his voice had a moderately dysphoric quality, he displayed simplified expressive and receptive language skills, his affect was moderately dysphoric, and his mood was depressed. He had moderately impaired attention and concentration, as well as moderately impaired immediate and recent memory, all due to depression and limited intellectual capacity. T.376-77. He also had difficulty with serial threes and simple calculations. Dr. Ransom stated that Plaintiff's intellectual functioning appeared to be in the borderline range. For her medical source statement, Dr. Ransom opined that Plaintiff can follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule and learn simple new tasks; but he has moderate difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress due to major depressive disorder (currently moderate) and his probable borderline intellectual capacity. T.377.

Plaintiff saw his primary care physician, Dr. Hoilette, once a month during the period from August 2, 2012, from December 3, 2012. Plaintiff informed Dr. Hoilette that he was having continued pain and some intermittent swelling; he walked with a little bit of a limp. On September 10, 2012, Plaintiff told Dr. Hoilette that he has to have another knee surgery to remove an osteochondroma, and

said that "[o]rtho wants to keep him on the percocet at 120 pills per month." T.415. In November 2012, Plaintiff newly complained of worsening headaches that felt like a squeezing sensation on the sides of the head and were associated with photophobia, phonophobia, and some nausea. In December 2012, he informed Dr. Hoilette that he was still awaiting insurance approval for a second knee surgery.[2]

From February 14, 2013, through September 25, 2013, Plaintiff sought treatment for his depressive symptoms at Unity Mental Health (Pinewild). Medication management was overseen by Dinesh M. Nanavati, M.D. Steven Kassirer, MHC Intern, and later Michael Tursi, LMHC, provided one-on-one counseling. Diagnoses were generalized anxiety disorder, PTSD following the death of his grandmother, with whom he was extremely close, and social phobia. These conditions were characterized by symptoms of excessive worry, racing thoughts, sleep disturbance, and social isolation.

## THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner for determining disability claims. At step one, the ALJ found that Plaintiff met the insured status

---

[2]
 The Court cannot find any treatment notes in the record around the timeframe of these comments by Plaintiff to Dr. Hoilette in which a physician had recommended that Plaintiff undergo another surgery. The notes in the record from Plaintiff's orthopedic surgeon, Dr. Bronstein, only cover the period from November 22, 2010, to November 21, 2011. See T.315-24. There are no other treatment records from an orthopedist or surgeon in the administrative transcript. The Court notes that Plaintiff's attorney has not argued that the record is incomplete.

requirements of the Act through March 31, 2010, and had not engaged in substantial gainful activity since June 30, 2009, the alleged onset date.

At step two, the ALJ determined that Plaintiff has the following "severe" impairments: tear of the lateral meniscus of the right knee; status-post arthroscopic repair; major depressive disorder; PTSD; and anxiety. The ALJ found Plaintiff's asthma to be non-severe because it is well controlled by medication and does not impose more than a minimal impact upon his ability to perform work-like activities.

At step three, the ALJ determined that Plaintiff does not meet or medically equal a listed impairment. The ALJ gave particular consideration to Listings 1.02 (dysfunction of a major joint), 12.04 (affective disorders), and 12.06 (anxiety related disorders). The ALJ found that in activities of daily living, Plaintiff has no restriction; in social functioning, Plaintiff has moderate difficulties; and in maintaining concentration, persistence or pace, Plaintiff has moderate difficulties. He has experienced no episodes of decompensation, of extended duration.

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC"), and concluded that notwithstanding his "severe" impairments, he retains the ability to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) "except [he] . . . can lift and/or carry up to twenty-five pounds; can sit

without limitations; is limited to standing and/or walking no more than two hours in an eight-hour day; . . . must have a break from work every two hours; and . . . is limited to work that is "rather simple," that is, with a 'specific vocational preparation' ("SVP") level of 3 or below."

At step four, the ALJ found that Plaintiff, aged 25 years on the onset date, was a "younger individual age 18-44," with a limited education (eleventh grade). Transferability of job skills was not an issue because Plaintiff had no relevant work. Indeed, the ALJ noted, Plaintiff "has a very loose connection with the workforce[,]" not having worked since 2007, about two years before his alleged onset date in 2009.

At step five, the ALJ relied on the VE's hearing testimony to find that, considering Plaintiff's age, education, work experience, and RFC, there are jobs in the national economy he can perform, including such representative positions as products assembler II (DOT #739.687-030, light, unskilled work, SVP 2); order clerk, food and beverage (DOT #209.567-014, sedentary, unskilled work, SVP 2); and addresser (DOT #209.587-010, sedentary, unskilled, work, SVP 2). Accordingly, the ALJ entered a finding of not disabled.

## SCOPE OF REVIEW

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such

findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). "Failure to apply the correct legal standards is grounds for reversal." Townley, 748 F.2d at 112.

## DISCUSSION

Plaintiff argues that the RFC assessment is not supported by substantial evidence because the ALJ failed to properly weigh the medical opinion evidence and improperly discredited his subjective statements about his limitations. In particular, Plaintiff contends, the ALJ "failed to adopt any opinion evidence of record[,]" which means that the RFC determination is based on "bare medical evidence." Pl's Mem. at 13. Plaintiff argues that because the ALJ did not assign full weight to any particular medical opinion, he thereby relied on "his own opinion as the only foundation for determining the RFC." Id.

The cases Plaintiff cites in support of his argument, such as Gross v. Astrue, No. 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014), are inapposite here. Those cases dealt with situations where there was no opinion evidence; rather, the record contained bare medical findings without interpretive guidance from a physician. See id. ("Although there are many treatment notes in the record, including those from both primary care physicians and specialists, the records generally contain bare medical findings and do not address or shed light on how Gross's impairments affect his physical ability to perform work-related functions. Indeed, the only opinion as to Gross's physical limitations was provided by . . . a non-treating, non-examining agency employee who does not qualify as an acceptable medical source."). Here, in contrast, there were multiple properly submitted medical opinions that the ALJ weighed. To the extent Plaintiff argues that the RFC determination is unsupported by substantial evidence because it does "not perfectly correspond with any of the opinions of medical sources cited in his decision," Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (unpublished opinion), the Second Circuit does not impose such a requirement. See id. (finding that although ALJ's opinion did not perfectly correspond with the opinions in the record, ALJ "was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole") (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)

("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").

The physical aspect of the RFC assessment took account of the opinions in the record issued by Plaintiff's primary care physician and consultative physician Dr. George Alexis Sirotenko, as well as the treatment notes from the other treatment providers and Plaintiff's reported activities. For instance, the ALJ's finding that Plaintiff could perform a range of sedentary work is consistent with consultative physician Dr. Sirotenko's report, which included no limitations on sitting, the major functional activity involved in sedentary work. See, e.g., 20 C.F.R. §§ 404.1567(a), 416.927(a) (noting that "a sedentary job is defined as one which involves sitting"). The ALJ's finding likewise is not inconsistent with primary care physician Dr. Hoilette's various reports on Plaintiff's functional limitations, issued at the request of the Monroe County Department of Social Services. In none of these opinions did Dr. Hoilette find Plaintiff to be more than "moderately limited" in sitting, defined on the form as being able to sit for 2 to 4 hours in an 8-hour work day. In fact, on December 21, 2010, and January 14, 2013, Dr. Hoilette found "no evidence of limitations" in sitting, defined on the form as being able to sit for more than 4 hours in an 8-hour work day. Significantly, the most restrictive report issued by Dr. Hoilette was on March 13,

2012, which was only 4 months post-surgery. The two subsequent reports showed improvement in Plaintiff's functional capabilities: The January 14, 2013 report contained no limitations for sitting and estimated that Plaintiff could walk for 2 to 4 hours and stand for 2 to 4 hours in an 8-hour work day. T.675. While Dr. Hoilette's July 9, 2013 report limited Plaintiff to sitting for 2 to 4 hours in an 8-hour work day, it actually supports an RFC of a greater exertional level, since Dr. Hoilette also found that Plaintiff could both walk and stand for 2 to 4 hours each in an 8-hour work day. T.671. To the extent that Dr. Hoilette appeared to accept Plaintiff's subjective statements about his limitations and need for an additional surgery without corroborating notes from his orthopedist or supporting objective findings, the ALJ was within his discretion to discount that aspect of the opinion. See Ratliff v. Barnhart, 92 F. App'x 838, 840 (2d Cir. 2004) (unpublished opn.) ("Given that this [treating source] opinion was based solely on Ratliff's representations rather than [the treating source]'s first-hand observations, and in any event provides no evidence as to Ratliff's condition in 1991, the ALJ was correct in not giving [the] opinion controlling weight.").

Plaintiff argues that the RFC is at odds with the relatively restrictive report from consultative physician Harbinder Toor, M.D., issued February 3, 2012. According to Dr. Toor, Plaintiff was having "constant, sharp" pain, "sometimes 10 out of 10 on the pain

scale." Plaintiff had trouble getting on and off the examination table and out of the chair, and walked with an abnormal gait, limping to the right side. Dr. Toor opined that he had a "guarded" prognosis, with "moderate to severe limitations standing, walking, squatting or heavy lifting" and "moderate limitation sitting a long time." These observations are inconsistent with notes from treating physician Dr. Hoilette from March 13, 2012, as well as the January 23, 2012 notes from Plaintiff's then-physical therapist, DPT Collins, who had seen him over the course of two months for 11 appointments. At the January 23, 2012 visit, about 10 days before the consultative examination with Dr. Toor, Plaintiff told DPT Collins that he had engaged in "some dancing activities" since his last visit in December 2011. T.421. Plaintiff rated his maximum pain at a 6-7 out of 10 on the pain scale, and that level of pain occurred when he was dancing. He said that he could walk distances with minimal pain. At the appointment, he reported that his pain was a zero out of 10. T.425. On examination, he had a "very mildly antalgic gait." T.421. DPT Collins recommended "strengthening of [the] hip to allow for proper form with dance movements and take stress off of knees." T.421. According to DPT Collins, Plaintiff had a "good" prognosis, would benefit from continued rehabilitation, and had no contraindications/precautions. T.421, 425. The Court recognizes that DPT Collins is not an "acceptable medical source" as defined in the Commissioner's regulations;

however, she had the benefit of seeing Plaintiff on a fairly regular basis over the course of several months. See Hernandez v. Astrue, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011) ("[I]t is possible for the opinion of a non-acceptable medical source with a particularly lengthy treating relationship with the claimant to be entitled to greater weight than an 'acceptable medical source' such as a treating physician who has rarely had contact with the claimant.") (citing Saxon v. Astrue, 781 F. Supp.2d 92, 103-04 (N.D.N.Y. 2011); Anderson v. Astrue, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009)).

Since Plaintiff has not established that the physical aspect of the ALJ's RFC assessment was unsupported by substantial evidence, the Court turns next to the mental portion of the RFC. Plaintiff argues that notwithstanding the ALJ's restriction of Plaintiff to "rather simple" work with an SVP (Specific Vocational Preparation) of "3", the RFC failed to account for the limitations assessed by consultative psychologist Dr. Ransom. The Court agrees that the ALJ does not adequately take into account Dr. Ransom's fairly restrictive opinion regarding Plaintiff's ability to maintain concentration, persistence, and pace, which was supported by her clinical findings. Also, the ALJ failed to account for the limitations caused by Plaintiff's generalized anxiety and social phobia.

SVP is defined as the "'amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" Puente v. Comm'r of Soc. Sec., 130 F. Supp.3d 881, 886 n. 2 (S.D.N.Y. 2015) (quoting O*NET OnLine Help, https://www.onetonline.org/help/online/svp).[3] The SVP "levels" merely correspond to time periods; Level 3 is a time period of "[o]ver 1 month up to and including 3 months." Id. "'Using the skill level definitions in 20 [C.F.R. §§] 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.'" King v. Comm'r of Soc. Sec., No. 1:12-CV-1686 GLS, 2013 WL 5567112, at *2 (N.D.N.Y. Oct. 9, 2013) (quoting Social Security Ruling ("SSR") SSR 00-4p, 65 Fed. Reg. at 75760, 2000 WL 1765299 (S.S.A. Dec. 4, 2000); brackets in original).

Here, the ALJ did not reconcile how SVP of 3, which corresponds to semi-skilled work, is consistent with Dr. Ransom's opinion regarding Plaintiff's probable borderline intellectual functioning. The ALJ's mental RFC assessment, used at steps 4 and 5 of the sequential evaluation process, omitted the "more detailed

---

[3] "The DOT has been replaced by an online database called the Occupational Information Network or the O*NET." Puente, 130 F. Supp.3d at 886 n. 2 (citing Dictionary of Occupational Titles 4th Ed., Rev. 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm).

assessment [than that made at step 3]" which requires "itemizing various functions contained in the broad categories found in paragraphs B and C [of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF]." Karabinas v. Colvin, 16 F. Supp.3d 206, 215 (W.D.N.Y. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. Jul. 2, 1996)). When making findings about a claimant's mental RFC, an ALJ may not avoid conducting the "detailed assessment" referenced in SSR 96-8p "by merely indicating that the claimant can perform simple, unskilled work." Thompson v. Astrue, No. 10-CV-6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (citing Hudson v. Comm'r of Soc. Sec., No. 5:10-CV-300, 2011 WL 5983342, at *9-10 (D. Vt. Nov. 2, 2011); other citations omitted). However, the ALJ committed this error here. See, e.g., Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180–1181 (11th Cir. 2011) (holding that limiting claimant to simple, routine tasks or to unskilled work would not, standing alone, typically suffice to account for a claimant's moderate limitations in concentration, persistence, or pace).

Further, the ALJ improperly discredited Dr. Ransom's opinion that Plaintiff has moderate difficulty in relating to others and managing stress. The treatment notes from Plaintiff's visits with his mental health therapists document Plaintiff's anxiety and perseveration about tragedies and violent events reported in the news, which caused him to not wish to venture outside his

apartment, as well as his development of trust problems with people following his grandmother's death (which led to an unsuccessful suicide attempt), and resultant withdrawal from social contact with friends and family. The ALJ discounted Plaintiff's symptoms of social phobia on the basis that Plaintiff was "happy" that his best friend was moving into the apartment below him. This is a mischaracterization of the record; Plaintiff expressed hopefulness that this would help ease his social isolation. T.458. The ALJ further found Plaintiff's allegations of social anxiety undermined because he said he was going to have a barbeque with friends on the anniversary of his grandmother's death to celebrate her life, since he could not afford to travel to Florida to be with his family on that date. Again, this is mischaracterization of the record since Plaintiff only planned to invite two people to the so-called "party"—his neighbor and his best friend. This certainly does not establish that Plaintiff is free from symptoms of social phobia or generalized anxiety disorder.

For the foregoing reasons, the Court cannot find that the ALJ's mental RFC assessment is supported by substantial evidence. Accordingly, remand is required.

## CONCLUSION

Defendant's Motion for Judgment on the Pleadings is denied, the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings consistent with this

Decision and Order. Specifically, on remand, the ALJ is directed re-weigh Dr. Ransom's consultative psychological report and re-assess Plaintiff's mental RFC in light of her opinion. The ALJ is directed to obtain up-to-date mental health treatment records for Plaintiff. Since the Court is remanding this matter, and because it is unclear whether Plaintiff has or has not been recommended to undergo a second knee surgery, the Court directs Plaintiff's attorney to assist the ALJ in obtaining the records necessary to answer that question. Depending on what information is gleaned from Plaintiff's physicians, it may be necessary for the ALJ to re-evaluate the exertional aspect of Plaintiff's RFC.

**SO ORDERED.**

S/Michael A. Telesca

  HON. MICHAEL A. TELESCA
  United States District Judge

Dated:    September 2, 2016
          Rochester, New York.